UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARRYL DEIVORY HARRIS,

        Plaintiff,                  CIVIL ACTION NO. 12-11873

    v.                           DISTRICT JUDGE LAWRENCE P. ZATKOFF

                                  MAGISTRATE JUDGE MARK A. RANDON

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 8, 11)

Plaintiff Darryl Deivory Harris challenges the Commissioner of Social Security's final denial of his benefits application. Cross motions for summary judgment are pending (Dkt. Nos. 8, 11). Plaintiff also responded to the Commissioner's motion (Dkt. No. 12). Judge Lawrence P. Zatkoff referred the motions to this Magistrate Judge for a Report and Recommendation (Dkt. No. 2).

## I.    RECOMMENDATION

Because the Administrative Law Judge ("ALJ") failed to provide a thorough analysis of his step three determination that Plaintiff's impairments did not meet the listing for mental retardation, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED**, Defendant's motion for summary judgment be **DENIED**, and the case be **REMANDED** to the Commissioner.

**II.     DISCUSSION**

   *A.     Framework for Disability Determinations*

Under the Social Security Act, (the "Act") Disability Insurance Benefits and Supplemental Security Income are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the

analysis reaches the fifth step without a finding that the claimant is disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of HHS*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### B. Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited such that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses") (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion"); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *See Bass v.*

*McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of HHS*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (internal quotation marks omitted). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant").

## III.   REPORT

### A.   *Administrative Proceedings*

Plaintiff applied for supplemental security income on April 29, 2008, alleging he became disabled on April 12, 2008 (Tr. 21). After the Commissioner initially denied Plaintiff's application, he appeared without counsel for a hearing before ALJ John J. Rabaut, who considered the case *de novo*.[1] In a written decision, the ALJ found Plaintiff was not disabled (Tr. 21-30). Plaintiff requested an Appeals Council review (Tr. 17). On March 21, 2012, the ALJ's decision became the final decision of the Commissioner when the Appeals Council declined further review (Tr. 1-3).

### B.   *ALJ Findings*

---

[1] Plaintiff is now represented by counsel.

-4-

Plaintiff was 19 years old on his application date. He did not complete the 11th grade and does not have any past relevant work (Tr. 29, 40). The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that he had not engaged in substantial gainful activity since his application date (Tr. 23).

At step two, the ALJ found that Plaintiff had the following "severe" impairments: a history of borderline intellectual functioning and status post gunshot wound (Tr. 23).[2] The ALJ found Plaintiff had the non-severe impairment of anti-social personality disorder (Tr. 23).[3]

At step three, the ALJ found no evidence that Plaintiff's impairments met or medically equaled one of the listings in the regulations (Tr. 23).

Between steps three and four, the ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") to perform:

> light work . . . except [Plaintiff] is limited to simple, routine, and repetitive tasks, performed in a work environment free of fast-paced production, involving only simple work-related decisions with few if any workplace changes; occasional interaction with the general public; no climbing ladders, ropes, or scaffolds; only occasionally [climbing] ramps and stairs; only occasional kneeling, crouching, stooping; and no crawling.

(Tr. 25).

At step four, the ALJ found that Plaintiff did not have any past relevant work (Tr. 29).

At step five, the ALJ denied Plaintiff benefits, finding he could perform a significant number of jobs available in the economy, such as laundry worker (7,900 jobs in the Michigan economy) and small products assembler (3,500 jobs in the Michigan economy) (Tr. 30).

    C.    *Administrative Record*

---

[2] These impairments cause Plaintiff more than minimal functional limitations (Tr. 23).

[3] This impairment causes Plaintiff no more than minimal functional limitations (Tr. 23).

### 1. Plaintiff's Hearing Testimony and Statements

Plaintiff was shot in the leg on April 12, 2008 (Tr. 42, 44)[4]; he was 19 and in the 11th grade (Tr. 51). Plaintiff testified that the shooting occurred because he was "set-up" by one of his best friends (Tr. 51). Plaintiff did not finish high school and has not worked since being shot (Tr. 42, 51).

Plaintiff described the physical and mental trauma that followed the shooting: he had intermittent pain in his knee that limited his ability to stand for more than 10 minutes and interfered with his sleep; he stayed in bed every other day, did not trust anyone and was scared to leave the house due to paranoia. Plaintiff said he could walk from his house to the street, lift 60 pounds, shower, shave, play video games and drive (although his leg "lock[ed] up" when he drove long distances) (Tr. 44-48, 50-52). Plaintiff did not have any problems with his hands or fingers (Tr. 50).

### 2. Medical Evidence

In 2002, when Plaintiff was in the sixth grade, his home-room teacher referred him for a psychological evaluation to determine his eligibility for special education services. According to the teacher, Plaintiff's reading comprehension and math computation skills were below his age and grade level; he required extra instructional assistance and modified class work (Tr. 266).

School Psychologist Anthony Pendleton, MA, LLP gave Plaintiff a series of intelligence tests and found that his overall scores as well as his verbal and nonverbal skills were all in the Mild Mentally Impaired Range (Tr. 267). Plaintiff was also found to be: (1) borderline mentally impaired in the areas of general fund of information, ability to differentiate essential from nonessential details, nonverbal concept formation, and ability to verbalize social judgment,

---

[4] Plaintiff told a psychologist he was robbed while attempting to sell a gun; the sale went bad and he was shot in the right knee (Tr. 294).

practical knowledge and numerical reasoning; and (2) moderately mentally impaired in verbal abstract reasoning, word knowledge, psychomotor processing speed and ability to synthesize concrete parts into meaningful whole relationships (Tr. 267). Mr. Pendleton concluded that Plaintiff would likely have trouble working under time pressure (Tr. 267). However, based on classroom observations, evaluation data and input from his parents and teacher, Plaintiff was determined to be ineligible for special education services (Tr. 268).

An Individualized Education Program Team Report was also completed when Plaintiff was in the sixth grade. According to the report, Plaintiff was performing at a third-grade level in math computation (Tr. 261-263). A Multi-disciplinary Evaluation Team Summary indicated Plaintiff had an IQ of 67 on the verbal scale, 65 on the performance scale and 64 on full-scale testing (Tr. 264).[5]

Plaintiff underwent another psychiatric evaluation at the Jefferson Medical Clinic on July 1, 2004. Plaintiff's mother indicated that Plaintiff's developmental milestones were slow; he repeated the seventh grade three times and he was a slow learner (Tr. 269). It was concluded that Plaintiff had a learning disability and might benefit from special education classes (Tr. 270). Plaintiff's global assessment of functioning ("GAF") score was 45 to 50.[6]

---

[5]An IQ score between 50-70 means mild mental retardation and extremely low intelligence. *See* http://www.wilderdom.com/intelligence/IQWhatScoresMean.html (last visited March 7, 2013) and http://www.iq-test.learninginfo.org/iq04.htm (last visited March 7, 2013).

[6]The GAF score is

a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). A GAF score of 31-40 indicates some impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood. A GAF of 41 to 50 means that the patient has serious

-7-

On August 27, 2004, Beth Clevenger, MA, LLP tested Plaintiff for mental retardation (Tr. 271). His mother reported that Plaintiff lacked common sense. Plaintiff told Ms. Clevenger that his last GPA (in the seventh grade) was 1.0/4.0 (Tr. 271). Testing revealed that Plaintiff was reading at a fifth-grade level and might benefit from a mental status evaluation to assess depression (Tr. 272). Ms. Clevenger diagnosed Plaintiff with borderline intellectual functioning: he had an IQ of 67 in verbal reasoning, 78 in abstract and visual reasoning, 82 in quantitative reasoning and 90 in short-term memory (Tr. 272-273).[7]

On June 26, 2008, Limited Licensed Psychologist, Linda Curtis, MA LLP, and Licensed Psychologist, Ronald Fenton, PhD, LP, CAS, assessed Plaintiff for permanent disability (Tr. 293-297). Plaintiff reported that he failed the sixth and seventh grades due to behavioral problems (Tr. 293-294); he exhibited anti-social personality traits that hindered his daily functioning at school, in relationships and in employment (Tr. 296). Plaintiff had borderline intellectual functioning and a GAF score of 65 (Tr. 296).

On July 11, 2008, it was determined that Plaintiff suffered from borderline intellectual functioning (Tr. 308). He was moderately limited in activities of daily living and in his ability to: (1) maintain concentration, persistence or pace; (2) understand and remember detailed

---

symptoms . . . OR any serious impairment in social, occupational, or school functioning (*e.g*., no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning.

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009). "A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x. 496, 502 fn. 7 (6th Cir. 2006).

[7]An IQ score between 70-79 means borderline intelligence, between 80-89 means low average intelligence and between 90-109 means average intelligence. *See* http://www.iq-test.learninginfo.org/iq04.htm (last visited March 7, 2013).

instructions; (3) carry out detailed instructions; (4) maintain attention and concentration for extended periods; (5) complete a normal workday and workweek without interruptions from psychologically-based symptoms; (6) perform at a consistent pace without an unreasonable number and length of rest periods; (7) interact appropriately with the general public; (8) accept instructions and respond appropriately to criticism from supervisors; (9) maintain socially appropriate behavior; (10) adhere to basic standards of neatness and cleanliness; and (11) set realistic goals or make plans independently of others (Tr. 317, 321-322).  Plaintiff was mildly limited in his ability to maintain social functioning (Tr. 317).

On August 10, 2010, a Medical Source Statement indicated Plaintiff had appetite disturbance with weight change; sleep disturbance; personality change; mood disturbance; recurrent panic attacks; paranoia or inappropriate suspiciousness; feelings of guilt and worthlessness; difficulty thinking or concentrating; time or place disorientation; social withdrawal or isolation; blunt, flat or inappropriate affect; decreased energy; intrusive recollections of a traumatic experience; persistent irrational fears; generalized persistent anxiety; and pathological dependence or passivity (Tr. 326).  Plaintiff was moderately limited in the ability to: (1) carry out very short, simple instructions; (2) carry out detailed instructions; and (3) work in coordination with or proximity to others without being unduly distracted (Tr. 327).  He was markedly limited in his ability to: (1) maintain attention and concentration for extended periods; (2) maintain regular attendance and be punctual; (3) sustain an ordinary routine without special supervision; (4) deal with the stress of semi-skilled and skilled work; (5) interact appropriately with the public; and (6) maintain social functioning (Tr. 327-328).  Plaintiff was extremely limited in his ability to complete a normal workday or workweek without interruptions from psychologically-based symptoms (Tr. 327).  He frequently had deficiencies of concentration, persistence or pace resulting in the failure to complete tasks in a timely manner;

and repeated episodes of deterioration or decompensation in work or work-like settings that caused him to withdraw from that situation or to experience exacerbation of signs and symptoms (Tr. 328).

On August 11, 2010, a Medical Source Statement indicated that Plaintiff had a reduced range of motion and chronic pain in his right knee and hip (Tr. 331). Plaintiff's pain frequently interfered with his attention and concentration, and he was moderately limited in his ability to deal with work stress (Tr. 332). Plaintiff could: (1) sit for one to two hours before he had to walk around for 15 minutes; and (2) stand and walk 30 minutes to an hour before he had to lie down or recline for 15 minutes (Tr. 332-334). Plaintiff could sit for five to six hours during an eight-hour work day and stand and walk four to five hours in an eight-hour work day (Tr. 334-335). He would have more than three absences a month due to his impairments (Tr. 330).

### 3. Vocational Expert

The ALJ asked a vocational expert ("VE") to assume a hypothetical individual who: requires simple, routine and repetitive tasks performed in a work environment free of fast-paced production; simple, work-related decisions; few, if any, workplace changes; and no exertional limitations (Tr. 55). The VE testified that such an individual could perform work at the medium exertional level as a hospital cleaner and industrial building cleaner (Tr. 55-56).

When the ALJ added to the hypothetical that the individual could only have occasional interaction with the general public, the VE testified that he could still perform the identified jobs (Tr. 56).

In another hypothetical, the VE was asked to assume an individual who could perform work at the light exertional level with no climbing ladders, ropes or scaffolds; only occasionally climbing ramps or stairs; only occasional kneeling, crouching and stooping; no crawling; simple, routine, repetitive tasks performed in a work environment free of fast-paced production; that

-10-

involves simple, work-related decisions with few, if any, workplace changes and only occasional interaction with the general public (Tr. 56-57). The VE testified that such an individual could perform work at the light exertional level as a laundry worker and small products assembler (Tr. 57).

The individual would be precluded from work, if he: (1) could not maintain sufficient concentration, persistence or pace to perform the simple, routine, repetitive tasks on a regular and continuing basis; (2) missed more than one unscheduled day per month; or (3) required more than one unscheduled partial day off per month (i.e., arrived late, left early or required extended breaks) (Tr. 57).

### D.     *Plaintiff's Claim of Error*

Plaintiff argues that the ALJ erred at step three of the disability analysis by not properly analyzing whether he met listing 12.05(C):

> **12.05** *Mental retardation*: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> .   .   .
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

Plaintiff has the burden to demonstrate he satisfies listing 12.05(C). *See Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001). In addition to an IQ of 60-70 and another physical or mental impairment that limits Plaintiff's function, Plaintiff must present evidence to support "onset of the 'significantly subaverage general intellectual functioning with deficits in adaptive

-11-

functioning' before age 22." *Id.* at 354-55.[8] "Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills." *West v. Comm'r of Soc. Sec.*, 240 Fed.Appx. 692, 698 (6th Cir. 2007) (citation omitted). "The American Psychiatric Association defines adaptive-skills limitations as '[c]oncurrent deficits or impairments . . . in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'" *Hayes v. Comm'r of Soc. Sec.*, 357 Fed.Appx. 672, 677 (6th Cir. 2009) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders Text Revision, § 317 (4th ed. 2000) at 49)). An actual diagnosis of mental retardation is not required to satisfy listing 12.05(C), but the ALJ may consider the fact that no such diagnosis exists. *See Hardiman v. Astrue*, No. 3:11-cv-665, 2012 WL 684843 at *7 (N.D. Ohio March 2, 2012) (citation omitted). The ALJ must provide a reasoned explanation for his findings and conclusions:

> Under a theory of presumptive disability, [Plaintiff] is eligible for benefits if he has an impairment that meets or medically equals an impairment found in the Listing. The Listing describes impairments that are severe enough to prevent [Plaintiff] from doing any gainful activity. 20 C.F.R. § 404.1425(a). If [Plaintiff] cannot show that he meets a listed impairment, he may be able to establish that his impairment "is at least equal in severity and duration to the criteria of any listed impairment." *Id.* [at] § 404.1526(a). When considering presumptive disability at Step Three, an ALJ must analyze [Plaintiff's] impairments in relation to the Listed impairments and must give a reasoned explanation of his findings and conclusions in order to facilitate meaningful review.

---

[8]Defendant does not dispute that Plaintiff meets the requirement that he have a "physical or other mental impairment imposing an additional and significant work-related limitation of function." And, at step two of the disability analysis, the ALJ found Plaintiff's "status post gunshot wound" constituted a severe impairment (Tr. 23).

*Christephore v. Comm'r of Soc. Sec.*, No. 11-13547, 2012 WL 2274328 at *6 (E.D. Mich. June 18, 2012) (citing *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011)). Here, the ALJ simply stated:

> [Plaintiff] does not exhibit the difficulties in adaptive functioning required under 12.05. He was never recommended for special education, and is able to handle his activities of daily living or any other activity for which he is motivated. He took and passed his driving test and is excellent at video games such as Madden football. Further, [Plaintiff's] presentation at the hearing indicates he is functioning above the dated IQ test scores, and I find they are now invalid.

(Tr. 24-25).[9] This Magistrate Judge finds the ALJ did not provide a properly reasoned listing 12.05(C) analysis. For example, the ALJ's limited analysis did not consider the objective medical evidence – before Plaintiff's 22nd birthday – that he had: (1) reading comprehension and math computation skills below his age and grade level; (2) no relevant work experience; (3) anti-social personality traits that hindered his daily functioning, relationships and employment ability; (4) a GAF score of 45 to 50, which means serious impairment in social, occupational or school functioning; (5) moderate limitations in activities of daily living, and in the ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, maintain socially appropriate behavior, and work in coordination with others without being distracted; (6) recurrent panic attacks, paranoia and social withdrawal; and, at one point, (7) marked limitations in his ability to interact appropriately with the public and maintain social functions. The ALJ also did not use objective medical evidence to invalidate Plaintiff's IQ scores; Plaintiff's presentation at the hearing is not a sufficient reason to find he can function above the reported scores. *See Sparck v. Comm'r of Soc. Sec.*, No. 11-10521, 2012 WL 4009650 at *8 (E.D. Mich. Aug. 23, 2012) ("ALJs must not succumb to the temptation to

---

[9]The fact that Plaintiff can drive and play video games says nothing about Plaintiff's social or daily living skills.

play doctor and make their own independent medical findings") (citations omitted).[10] Absent a thorough analysis of the reasons Plaintiff does not meet the mental retardation listing, this Magistrate Judge finds the ALJ's decision is not supported by substantial evidence.

## IV. CONCLUSION

Because the Administrative Law Judge ("ALJ") failed to provide a thorough analysis of his step three determination that Plaintiff's impairments did not meet the listing for mental retardation, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED**, Defendant's motion for summary judgment be **DENIED**, and the case be **REMANDED** to the Commissioner for additional consideration of whether Plaintiff satisfies listing 12.05(C).

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *See McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at

---

[10]This Magistrate Judge considered Defendant's argument that the ALJ properly analyzed listing 12.05, because he noted that Plaintiff only had "mild" limitations in activities of daily living: he could shower, shave and take care of his personal needs (Dkt. No. 11 at 15 (CM/ECF pagination), Tr. 24). However, the ALJ made this notation while analyzing whether Plaintiff satisfied listings 12.02 and 12.04. Defendant also argues that the ALJ made additional notations in his decision regarding Plaintiff's social skills and activities of daily living (Dkt. No. 11 at 15 (CM/ECF pagination), Tr. 26-27). However, the ALJ made these notations between steps three and four of the disability analysis – *after* he determined Plaintiff did not satisfy listing 12.05.

596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this Magistrate Judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. *See* E.D. Mich. LR 72.1(d)(3), (4).

> s/Mark A. Randon
> Mark A. Randon
> United States Magistrate Judge

Dated: March 14, 2013

## Certificate of Service

I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, March 14, 2013, by electronic and/or ordinary mail.

> *s/Eddrey Butts*
> *Acting Case Manager for Magistrate Judge Randon*