UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARRYL DEIVORY HARRIS,

    Plaintiff,

v.                                                          Case No. 12-11873
                                                           Hon. Lawrence P. Zatkoff

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.
_____/

## OPINION AND ORDER

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on September 10, 2013

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

### I. INTRODUCTION

This matter is before the Court on Magistrate Judge Randon's Report and Recommendation ("Report") [dkt 13], in which the Magistrate Judge recommends that the Court grant Plaintiff's Motion for Summary Judgment [dkt 40], and deny Defendant's Motion for Summary Judgment [dkt 44]. No objections have been filed.

The Magistrate's Report recommends granting Plaintiff's Motion because the Administrative Law Judge ("ALJ") failed to provide a thorough analysis of his step-three determination that Plaintiff's impairments did not meet the listing for mental retardation. The Court, however, disagrees with the Magistrate's findings and REJECTS the Report and Recommendation.

For the reasons set forth below, Plaintiff's Motion for Summary Judgment is DENIED and

1

Defendant's Motion for Summary Judgment is GRANTED.

## II. BACKGROUND

The Court adopts the background information, legal standards, and factual findings set forth in the Report and Recommendation:

### A. Framework for Disability Determinations

Under the Social Security Act, (the "Act") Disability Insurance Benefits and Supplemental Security Income are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d

528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of HHS*, 14 F.3d 1107, 1110 (6th Cir. 1994).

***

**B. ALJ Findings**

Plaintiff was 19 years old on his application date. He did not complete the 11th grade and does not have any past relevant work (Tr. 29, 40). The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that he had not engaged in substantial gainful activity since his application date (Tr. 23).

At step two, the ALJ found that Plaintiff had the following "severe" impairments: a history of borderline intellectual functioning and status post gunshot wound (Tr. 23). The ALJ found Plaintiff had the non-severe impairment of anti-social personality disorder (Tr. 23).

At step three, the ALJ found no evidence that Plaintiff's impairments met or medically equaled one of the listings in the regulations (Tr. 23).

Between steps three and four, the ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") to perform:

> light work . . . except [Plaintiff] is limited to simple, routine, and repetitive tasks, performed in a work environment free of fast-paced production, involving only simple work-related decisions with few if any workplace changes; occasional interaction with the general public; no climbing ladders, ropes, or scaffolds; only occasionally [climbing] ramps and stairs; only occasional kneeling, crouching, stooping; and no crawling. (Tr. 25).

At step four, the ALJ found that Plaintiff did not have any past relevant work (Tr. 29). At step five, the ALJ denied Plaintiff benefits, finding he could perform a significant number of jobs available in the economy, such as laundry worker (7,900 jobs in the Michigan economy) and small products assembler (3,500 jobs in the Michigan economy) (Tr. 30).

**C. Administrative Record**

### *1. Plaintiff's Hearing Testimony and Statements*

Plaintiff was shot in the leg on April 12, 2008 (Tr. 42, 44); he was 19 and in the 11th grade (Tr. 51). Plaintiff testified that the shooting occurred because he was "set-up" by one of his best friends (Tr. 51). Plaintiff did not finish high school and has not worked since being shot (Tr. 42, 51).

Plaintiff described the physical and mental trauma that followed the shooting: he had

intermittent pain in his knee that limited his ability to stand for more than 10 minutes and interfered with his sleep; he stayed in bed every other day, did not trust anyone and was scared to leave the house due to paranoia. Plaintiff said he could walk from his house to the street, lift 60 pounds, shower, shave, play video games and drive (although his leg "lock[ed] up" when he drove long distances) (Tr. 44-48, 50-52). Plaintiff did not have any problems with his hands or fingers (Tr. 50).

### *2. Medical Evidence*

In 2002, when Plaintiff was in the sixth grade, his home-room teacher referred him for a psychological evaluation to determine his eligibility for special education services. According to the teacher, Plaintiff's reading comprehension and math computation skills were below his age and grade level; he required extra instructional assistance and modified class work (Tr. 266). School Psychologist Anthony Pendleton, MA, LLP gave Plaintiff a series of intelligence tests and found that his overall scores as well as his verbal and nonverbal skills were all in the Mild Mentally Impaired Range (Tr. 267). Plaintiff was also found to be: (1) borderline mentally impaired in the areas of general fund of information, ability to differentiate essential from nonessential details, nonverbal concept formation, and ability to verbalize social judgment, practical knowledge and numerical reasoning; and (2) moderately mentally impaired in verbal abstract reasoning, word knowledge, psychomotor processing speed and ability to synthesize concrete parts into meaningful whole relationships (Tr. 267). Mr. Pendleton concluded that Plaintiff would likely have trouble working under time pressure (Tr. 267). However, based on classroom observations, evaluation data and input from his parents and teacher, Plaintiff was determined to be ineligible for special education services (Tr. 268).

An Individualized Education Program Team Report was also completed when Plaintiff was in the sixth grade. According to the report, Plaintiff was performing at a third-grade level in math computation (Tr. 261-263). A Multi-disciplinary Evaluation Team Summary indicated Plaintiff had an IQ of 67 on the verbal scale, 65 on the performance scale and 64 on full-scale testing (Tr. 264).

Plaintiff underwent another psychiatric evaluation at the Jefferson Medical Clinic on July 1, 2004. Plaintiff's mother indicated that Plaintiff's developmental milestones were slow; he repeated the seventh grade three times and he was a slow learner (Tr. 269). It was concluded that Plaintiff had a learning disability and might benefit from special education classes (Tr. 270). Plaintiff's global assessment of functioning ("GAF") score was 45 to 50.

On August 27, 2004, Beth Clevenger, MA, LLP tested Plaintiff for mental retardation (Tr. 271). His mother reported that Plaintiff lacked common sense. Plaintiff told Ms. Clevenger that his last GPA (in the seventh grade) was 1.0/4.0 (Tr. 271). Testing revealed that Plaintiff was reading at a fifth-grade level and might benefit from a mental status evaluation to assess depression (Tr. 272). Ms. Clevenger diagnosed Plaintiff with borderline intellectual functioning: he had an IQ of 67 in verbal reasoning, 78 in abstract and visual reasoning, 82 in quantitative reasoning and 90 in short-term memory (Tr. 272-273).

4

On June 26, 2008, Limited Licensed Psychologist, Linda Curtis, MA LLP, and Licensed Psychologist, Ronald Fenton, PhD, LP, CAS, assessed Plaintiff for permanent disability (Tr. 293-297). Plaintiff reported that he failed the sixth and seventh grades due to behavioral problems (Tr. 293-294); he exhibited anti-social personality traits that hindered his daily functioning at school, in relationships and in employment (Tr. 296). Plaintiff had borderline intellectual functioning and a GAF score of 65 (Tr. 296).

On July 11, 2008, it was determined that Plaintiff suffered from borderline intellectual functioning (Tr. 308). He was moderately limited in activities of daily living and in his ability to: (1) maintain concentration, persistence or pace; (2) understand and remember detailed instructions; (3) carry out detailed instructions; (4) maintain attention and concentration for extended periods; (5) complete a normal workday and workweek without interruptions from psychologically-based symptoms; (6) perform at a consistent pace without an unreasonable number and length of rest periods; (7) interact appropriately with the general public; (8) accept instructions and respond appropriately to criticism from supervisors; (9) maintain socially appropriate behavior; (10) adhere to basic standards of neatness and cleanliness; and (11) set realistic goals or make plans independently of others (Tr. 317, 321-322). Plaintiff was mildly limited in his ability to maintain social functioning (Tr. 317).

On August 10, 2010, a Medical Source Statement indicated Plaintiff had appetite disturbance with weight change; sleep disturbance; personality change; mood disturbance; recurrent panic attacks; paranoia or inappropriate suspiciousness; feelings of guilt and worthlessness; difficulty thinking or concentrating; time or place disorientation; social withdrawal or isolation; blunt, flat or inappropriate affect; decreased energy; intrusive recollections of a traumatic experience; persistent irrational fears; generalized persistent anxiety; and pathological dependence or passivity (Tr. 326). Plaintiff was moderately limited in the ability to: (1) carry out very short, simple instructions; (2) carry out detailed instructions; and (3) work in coordination with or proximity to others without being unduly distracted (Tr. 327). He was markedly limited in his ability to: (1) maintain attention and concentration for extended periods; (2) maintain regular attendance and be punctual; (3) sustain an ordinary routine without special supervision; (4) deal with the stress of semi-skilled and skilled work; (5) interact appropriately with the public; and (6) maintain social functioning (Tr. 327-328). Plaintiff was extremely limited in his ability to complete a normal workday or workweek without interruptions from psychologically-based symptoms (Tr. 327). He frequently had deficiencies of concentration, persistence or pace resulting in the failure to complete tasks in a timely manner; and repeated episodes of deterioration or decompensation in work or work-like settings that caused him to withdraw from that situation or to experience exacerbation of signs and symptoms
(Tr. 328).

On August 11, 2010, a Medical Source Statement indicated that Plaintiff had a reduced range of motion and chronic pain in his right knee and hip (Tr. 331). Plaintiff's pain frequently interfered with his attention and concentration, and he was moderately limited in his ability to deal with work stress (Tr. 332). Plaintiff could: (1) sit for one to two hours before he had to walk around for 15 minutes; and (2) stand and walk 30 minutes to an

hour before he had to lie down or recline for 15 minutes (Tr. 332–334). Plaintiff could sit for five to six hours during an eight-hour work day and stand and walk four to five hours in an eight-hour work day (Tr. 334–335). He would have more than three absences a month due to his impairments (Tr. 330).

### *3. Vocational Expert*

The ALJ asked a vocational expert ("VE") to assume a hypothetical individual who: requires simple, routine and repetitive tasks performed in a work environment free of fast-paced production; simple, work-related decisions; few, if any, workplace changes; and no exertional limitations (Tr. 55). The VE testified that such an individual could perform work at the medium exertional level as a hospital cleaner and industrial building cleaner (Tr. 55-56). When the ALJ added to the hypothetical that the individual could only have occasional interaction with the general public, the VE testified that he could still perform the identified jobs (Tr. 56).

In another hypothetical, the VE was asked to assume an individual who could perform work at the light exertional level with no climbing ladders, ropes or scaffolds; only occasionally climbing ramps or stairs; only occasional kneeling, crouching and stooping; no crawling; simple, routine, repetitive tasks performed in a work environment free of fast-paced production; that involves simple, work-related decisions with few, if any, workplace changes and only occasional interaction with the general public (Tr. 56-57). The VE testified that such an individual could perform work at the light exertional level as a laundry worker and small products assembler (Tr.57).

The individual would be precluded from work, if he: (1) could not maintain sufficient concentration, persistence or pace to perform the simple, routine, repetitive tasks on a regular and continuing basis; (2) missed more than one unscheduled day per month; or (3) required more than one unscheduled partial day off per month (i.e., arrived late, left early or required extended breaks) (Tr. 57).

### D. Plaintiff's Claim of Error

Plaintiff argues that the ALJ erred at step three of the disability analysis by not properly analyzing whether he met listing 12.05(C):

> **12.05** *Mental retardation*: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

6

Plaintiff has the burden to demonstrate he satisfies listing 12.05(C). *See Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001). In addition to an IQ of 60-70 and another physical or mental impairment that limits Plaintiff's function, Plaintiff must present evidence to support "onset of the 'significantly subaverage general intellectual functioning with deficits in adaptive functioning' before age 22." *Id.* at 354-55. "Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills." *West v. Comm'r of Soc. Sec.*, 240 Fed. App'x. 692, 698 (6th Cir. 2007) (citation omitted). "The American Psychiatric Association defines adaptive-skills limitations as '[c]oncurrent deficits or impairments . . . in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'" *Hayes v. Comm'r of Soc. Sec.*, 357 Fed. App'x. 672, 677 (6th Cir. 2009) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders Text Revision, § 317 (4th ed. 2000) at 49)). An actual diagnosis of mental retardation is not required to satisfy listing 12.05(C), but the ALJ may consider the fact that no such diagnosis exists. *See Hardiman v. Astrue*, No. 3:11-cv-665, 2012 WL 684843 at *7 (N.D. Ohio March 2, 2012) (citation omitted). The ALJ must provide a reasoned explanation for his findings and conclusions:

> Under a theory of presumptive disability, [Plaintiff] is eligible for benefits if he has an impairment that meets or medically equals an impairment found in the Listing. The Listing describes impairments that are severe enough to prevent [Plaintiff] from doing any gainful activity. 20 C.F.R. § 404.1425(a). If [Plaintiff] cannot show that he meets a listed impairment, he may be able to establish that his impairment "is at least equal in severity and duration to the criteria of any listed impairment." *Id.* [at] § 404.1526(a). When considering presumptive disability at Step Three, an ALJ must analyze [Plaintiff's] impairments in relation to the Listed impairments and must give a reasoned explanation of his findings and conclusions in order to facilitate meaningful review.

*Christephore v. Comm'r of Soc. Sec.*, No. 11-13547, 2012 WL 2274328 at *6 (E.D. Mich. June 18, 2012) (citing *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011)).

### III. LEGAL STANDARD

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited such that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."

7

*Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir.2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses") (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion"); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (internal quotation marks omitted). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247

8

("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant").

## IV. ANALYSIS

The dispute in this case centers on whether Plaintiff met the requirements of Listing 12.05(c) found in 20 CFR Part 404, Subpart P, App 1, which discusses the impairment of "Mental Retardation." To satisfy Listing 12.05(C), an individual must establish mental retardation by (1) showing deficits in adaptive functioning prior to age 22; (2) having an IQ score between 60 and 70; and (3) having another impairment imposing an additional and significant work-related limitation of function. *See West v. Comm'r of Soc. Sec.*, 240 Fed. App'x 692, 697 (6th Cir. 2007) ("In essence, then, a claimant must make three showings to satisfy Listing 12.05(C) . . . .").

The Magistrate Judge found that the ALJ failed to "make a thorough analysis of the reasons Plaintiff does not meet the mental retardation listing." The ALJ, however, was not required to "make a thorough analysis of the reasons Plaintiff does not meet" the listing. Rather, he was generally required to support his findings with substantial evidence and, at Step Three, "analyze [Plaintiff's] impairments in relation to the Listed impairments and . . . give a reasoned explanation of his findings and conclusions[.]" *See Christephore*, 2012 WL 2274328 at *6 (citation omitted). For the reasons below, the Court finds that the ALJ's findings were supported by substantial evidence and that he gave a reasoned explanation for finding that Plaintiff's impairments did not satisfy the mental retardation listing.

First, the ALJ found that Plaintiff failed to carry his burden of showing deficits in adaptive functioning prior to age 22:

> [Plaintiff] does not exhibit the difficulties in adaptive functioning required under 12.05. He was never recommended for special education, and is able to handle his activities of daily living or any other activity for which he is motivated. He took and passed his driving test and is excellent at video games such as Madden football. Further, [Plaintiff's] presentation at the hearing indicates he is functioning above the dated IQ test scores, and I find they are now invalid.

9

The Magistrate Judge, agreeing with Plaintiff, stated that these reasons were not enough to support the ALJ's findings. The Court disagrees.

The ALJ's reasons cannot be limited only to the paragraph highlighted above. The ALJ began his discussion of § 12.05 by incorporating by reference his previous findings made in connection with §§ 12.02 and 12.04. The ALJ declared that his findings as to § 12.05 mental retardation "reflect[] the degree of limitation I have found in the 'paragraph B' mental function analysis" conducted in connection with §§ 12.02 and 12.04  This is certainly a logical connection, as it is beyond dispute that the ALJ's analysis of Plaintiff's mental function bears significantly on his subsequent assessment of Plaintiff's mental retardation.

In analyzing Plaintiff's mental function, the ALJ opined on, among other things, Plaintiff's daily living skills, social skills, and communication:

> In activities of *daily living*, [Plaintiff] has mild restriction. The [Plaintiff] testified that he could shower, shave, and take care of his personal needs. At the psychological assessment he reported he was capable of cooking and he knew how to clean.
>
> In *social functioning*, the claimant has moderate difficulties. The claimant testified that sometimes his friends pick him up and they play Madden football. At the psychological assessment, the claimant reported having a good amount of friends. However, the claimant also was motivated by discussions of robbery, shootings, and having guns. The claimant was diagnosed with anti-social personality traits.
>
> With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant has a low IQ score and is operating in the borderline range of intelligence. The claimant also has some pain associated with his right knee most likely associated with trauma induced osteoarthritis.

According to the Sixth Circuit, these findings directly support the ALJ's assessment of Plaintiff's adaptive functioning. *See West v. Comm'r of Soc. Sec.*, 240 Fed.App'x 692, 698 (6th Cir. 2007) (citation omitted) ("adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills."). The relied-upon evidence was sufficient, especially when considering that the

10

ALJ was not required to discuss every piece of evidence. *See Kornecky*, 167 F. App'x at 508 ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party").

On these bases, the ALJ concluded that, rather than mental retardation, Plaintiff had borderline intellectual functioning. Indeed, courts have recognized the distinction between mental retardation and borderline intellectual functioning. *See Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999) ("Dr. Rosen made no diagnosis of mental retardation, terming Maggard's functioning as 'borderline'"); *Tucker*, 2008 WL 399573 at *6 ("First, the Court notes that none of the mental health experts of record, including Plaintiff's treating sources, diagnosed Plaintiff with mental retardation). And, notably, the record in this case contains not a single medical source who diagnosed Plaintiff with mental retardation, nor does Plaintiff allege so. *See Cooper v. Comm'r of Soc. Sec.*, 217 Fed. App'x 450, 452 (6th Cir. 2007) ("It is undisputed that no psychologist has diagnosed Cooper with mental retardation. The examiner and clinical psychologist who tested him diagnosed him instead as borderline intellectual functioning."); *Newland v. Apfel*, No. 97-4339, 1999 WL 435153 at *6 (6th Cir. June 17, 1999) ("[t]he record in this action supports the ALJ's conclusion that Newland's impairment was not medically equivalent to section 12.05(C) because Dr. Mills diagnosed borderline intellectual functioning, not mental retardation."). Conversely, the medical sources contained in the record instead diagnosed Plaintiff with borderline intellectual functioning. While an actual diagnosis of mental retardation is not required to satisfy listing 12.05(C), the ALJ could properly consider as evidence the fact that no such diagnosis exists. *See Hardiman v. Astrue*, No. 3:11-cv-665, 2012 WL 684843 at *7 (N.D. Ohio March 2, 2012) (citation omitted).

Last, the ALJ reasons, at least implicitly, that Plaintiff's impairments may also stem from a lack of motivation in certain areas, noting that "[Plaintiff] is able to handle his activities of daily living or any other activity *for which he is motivated*." (emphasis added). Tr. At 24–25. To illustrate, the ALJ alluded

to the fact that Plaintiff was likely motivated by a desire to obtain a driver's license and play videogames and, expectedly, performed well in those settings.

Accordingly, the ALJ provided a reasoned explanation for, and thus did not err in, finding Plaintiff's impairment to be borderline intellectual functioning. While evidence exists to conflict the ALJ's relied-upon evidence and support a finding in Plaintiff's favor on this issue, such evidence is not dispositive to the ALJ's findings if "it is also true that substantial evidence supports [Defendant's] finding." *Casey v. Sec'y of Health & Human Svc's*, 987 F.2d 1230, 1235 (6th Cir. 1993).

## V. CONCLUSION

For the reasons stated above, it is hereby ORDERED that Defendant's Motion for Summary Judgment [dkt 44] is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

Date: September 10, 2013

                                             s/Lawrence P. Zatkoff
                                             LAWRENCE P. ZATKOFF
                                             U.S. DISTRICT JUDGE